IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA

    v.            :      CRIMINAL NO. 2:16-CR-20254

Edward C. GALKA      :    HON. JUDITH E. LEVY

### United States' Response Opposing the Defendant's Motion for Compassionate Release and Request for Home Confinement.

Edward Galka engaged in multiple fraud schemes targeting the State of Michigan Unemployment Insurance Agency ("UIA") by creating 9 fictitious employers, and then submitting unemployment benefit claims in the names of 88 fake employees. The actual loss attributed to Galka was $342,775.00; the intended loss amount was $720,795.00.

Galka began serving his 96-month sentence on September 27, 2017. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A), petitioning the Court to order that his sentence be reduced to home confinement. His motion should be denied.

*First,* since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the

Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As of May 11, 2020, these directives have already resulted in at least 2,428 inmates being placed on home confinement. *See* BOP Covid-19 Website.

*Second*, Galka does not satisfy the statutorily mandated criteria for compassionate release. Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Galka's failure to meet the criteria in USSG § 1B1.13 alone forecloses relief. Even when Covid-19 is taken into account, Galka's age and medical conditions do not satisfy the requirements in § 1B1.13(1)(A) & cmt. n.1. Galka is 57 years old, and, according to his most recent prison medical records, is in reasonably good health given his age. Additionally, while Galka's 2016 criminal case was pending, he informed the Court that he was being treated for a pituitary brain

2

tumor. *See* PSR ¶ 90. He falsely claimed to Judge Gerald Rosen that the tumor had been diagnosed as being malignant, and for that reason he needed to be granted a bond, so that he could begin chemotherapy treatment. *See* Gov't Exhibit 1. While in BOP custody, however, Galka's "unspecified pituitary gland disorder" is being treated. *See*, Gov't Exhibit 2.[1]

His offense and criminal history also make him a danger to the community, *see* USSG § 1B1.13(2). After pleading guilty – but while still on bond – Galka continued to prey on members of the community by engaging in subsequent acts of fraud. Galka's post-plea conduct so disturbed the Court that at the sentencing hearing it did not grant him an acceptance of responsibility reduction, pursuant to U.S.S.G. § 3E.1.1. And, the § 3553(a) factors — which the Court must also consider under § 3582(c)(1)(A) — likewise do not support release because the nature and circumstances of Galka's offense are particularly egregious.  After federal authorities executed a search warrant at Galka's home in 2014, in an effort to avoid detection, he attempted to continue a similar unemployment benefits fraud scheme in the State of Maryland.

---

[1] To insure that the defendant's privacy rights are not infringed, the government will file these medical records under seal on May 12, 2020.

Moreover, respect for the law would also not be advanced by Galka's release, because to further his scheme he took advantage of unsuspecting people by stealing their identities, which conduct caused these innocent victims severe economic distress.

## Background

The defendant's involvement with the criminal justice system began at the age of 28, and since that time has continued throughout his life. He has received multiple terms of probation and three custodial sentences for numerous state offenses. In addition to the conduct in this case, following the federal search warrant conducted as part of this investigation, in January 2016, federal agents learned that Galka submitted at least 48 fraudulent unemployment insurance claims to the State of Maryland's Department of Labor, Licensing, and Regulation Division of Unemployment Insurance ("DLLR"). Each claim used an address that was traced to a commercial mail address where the owner of that private mailbox could retrieve its contents. The listed owner of this post office box was "Mike Austin." On March 17, 2016, agents learned that "Mike Austin" was scheduled to pick up mail from this Maryland location.  On that date, agents observed Galka enter and

leave this Maryland location with mail content in his possession.  The following day, two employees were interviewed by agents, and they picked Galka out of a photographic lineup; however, they knew him as "Mike Austin."

In 2017, Galka was convicted of: (i) aggravated identity theft; (ii) wire fraud; and, (iii) theft of government money. On September 27, 2017, Galka was sentenced to a term of 96 months.

Galka began serving his prison sentence on September 27, 2017, and is currently incarcerated at FCI Elkton. He is 57 years old, and his projected release date is August 2, 2023. His only underlying medical conditions are a pituitary gland disorder and a male genital organ disorder. Nevertheless, Galka has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic. On April 23, 2020, Galka submitted a compassionate release request to the BOP, citing the Covid-19 pandemic, but on April 28, 2020, his request was denied. *See* Gov't Exhibit 2.

## Argument

**I.     The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

### A.     The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. The current plan, which is in effect until May 18, 2020, requires that inmates in every institution be secured in their assigned cells or quarters for at least 14 days to stop the spread of the disease. Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. And the movement

6

of inmates and detainees between facilities is severely restricted, with exceptions only for medical treatment and similar exigencies.

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained

throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

## B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant

home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." ([03-26-2020 Directive to BOP](), at 1; *accord* [04-03-2020 Directive to BOP](), at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. ([03-26-2020 Directive to BOP](), at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 2,400 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. [BOP Coronavirus FAQs](). As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

([03-26-2020 Directive to BOP](); [04-03-2020 Directive to BOP]()).

These criteria not only make sense, but also fit the realities of the Covid-19 pandemic far better than any other solution does. The Bureau

of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release conditions, social-distancing protocols, and stay-at-home orders during the pandemic. And if a prisoner would be unlikely to take any

Covid-19 restrictions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

The Bureau of Prisons also must account for the current strain on society's first responders. Police departments in many cities have stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety, and those risks will only increase if communities are faced with a sudden influx of prisoners. That is just one reason, among many, why the Bureau of Prisons must focus on releasing inmates who are the most vulnerable to Covid-19 and whose release will least endanger the public.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not

11

place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.   The Court should deny Galka's motion for compassionate release.

Galka's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595–96 (3d Cir. 2020). Because this requirement is a statutory one and not judicially

13

crafted, it is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016); *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019).

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, § 3582(c)(1)(A), and release must be "consistent with" the Sentencing Commission's policy statements. As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for

14

the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. Galka has not exhausted his administrative remedies, and there are no extraordinary and compelling reasons to grant Galka compassionate release.

Galka has not yet exhausted his administrative remedies. A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020).

Statutory exhaustion requirements, like the one in § 3582(c)(1)(A), are mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016). As the Sixth Circuit has explained, there is a "sharp divide" that "separates statutory from prudential exhaustion." *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019). Unlike judicially crafted requirements, statutory requirements may not be excused, even to account for "special circumstances." *Ross*, 136 S. Ct. at 1856–57.

Section 3582(c)(1)(A) is likely even a *jurisdictional* bar on the Court's authority to consider a motion for compassionate release. The Sixth Circuit has labeled § 3582(c)'s limitations "jurisdiction[al]." *Williams*, 607 F.3d at 1125. The statute "speak[s] to the power of the court rather than to the rights or obligations of the parties." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994). And it delineates "when, and under what conditions," a court may exercise its "'adjudicatory authority.'" *Bowles v. Russell*, 551 U.S. 205, 212–13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005)). But even if § 3582(c) requirements were not considered truly jurisdictional, they would still be mandatory claim-processing rules that must be enforced when a party "properly rais[es]" them. *Eberhart*, 546 U.S. at 19 (2005). Thus, regardless of how it is labeled, § 3582(c)(1)(A)'s exhaustion requirement is mandatory. *See Ross*, 136 S. Ct. at 1856–57; *United States v. Marshall*, 954 F.3d 823, 826–29 (6th Cir. 2020).

The only court of appeals to address this question has agreed. In *United States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020), the Third Circuit held that the Covid-19 pandemic does not permit inmates or district judges to bypass § 3582(c)(1)(A)'s exhaustion requirement.

16

Rather, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id.* at 597.

The majority of district courts to decide this question nationwide, including many in our district, have similarly held that a "failure to exhaust" under § 3582(c)(1)(A) "cannot be excused, even in light of the Covid-19 pandemic." *United States v. Alam*, No. 15-20351, 2020 WL 1703881, at *2–*3 (E.D. Mich. Apr. 8, 2020); *accord United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020); *United States v. Mathews*, No. 14-CR-20427-02, 2020 WL 1873360, at *2–*3 (E.D. Mich. Apr. 15, 2020). As one of the those decisions has explained, the few courts that have excused exhaustion under § 3582(c)(1)(A) have mistakenly relied on cases addressing *judge-made* exhaustion requirements, not *statutory* exhaustion requirements. *Mathews*, 2020 WL 1873360, at *2–*3.

Although his request for compassionate release was denied by the Warden on April 28, 2020, Galka must wait until the earlier of 30 days from filing, or fully exhausting his administrative appeals, which would include appealing to the Director of BOP. *See* 18 U.S.C. 3582(c)(1)(A).

17

Galka filed his request with the Warden on April 23, 2020, and despite the Warden's denial, it does not appear that Galka has fully exhausted his administrative appeals, or that 30 days have elapsed since he filed his request.

Nonetheless, even if Galka had waited until May 23, 2020 to file this motion, compassionate release would be improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describe[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same

18

language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant

19

compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

The Covid-19 pandemic does not alter this analysis here. Even assuming, in other cases, that a defendant's risk from Covid-19 might make the difference in his eligibility for release under § 1B1.13, Galka's circumstances do not satisfy that standard. Galka is not an inmate with a terminal medical condition. Neither is he an elderly inmate. He has not raised the incapacitation of a family member, spouse, or registered partner argument. As Galka's prior conduct shows, including the fact that he continued his fraudulent conduct after the federal search warrant, and right before his sentencing hearing. He would also be unlikely to follow basic restrictions on release—much less the CDC's social-distancing protocols or a stay-at-home order. It is hardly clear that Galka faces a greater risk now than he would if released.

Nor does the Covid-19 pandemic by itself qualify as the type of inmate-specific reason permitting compassionate release. As the Third Circuit explained, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering

20

BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Galka and other inmates. Nothing in the statute or USSG § 1B1.13 supports the unbounded interpretation of § 3582(c)(1)(A) that he now asks this Court to adopt. *See Raia*, 954 F.3d at 597.

Galka is also ineligible for compassionate release for another reason: he remains a danger to the community. Section 1B1.13(2) only permits release if a defendant is "not a danger to the safety of any other person or to the community."

Galka has a long history with the criminal justice system; in fact, due to his many convictions between 1992 and 2012 he was in criminal history category VI. As described above, Galka was involved in a similar scheme to defraud the State of Maryland, *after* the search warrants in this investigation. The Court was so concerned about his 2017 conduct that it refused to give the defendant the three level acceptance of responsibility reduction. In addition, after his sentencing hearing occurred, the government learned of one last brazen act of fraud by

21

Galka. Approximately, two days before his sentencing hearing, which was scheduled for September 27, 2017, Galka presented a fraudulent military document to the rental office of the apartment complex where he was then residing. *See* Gov't Exhibit 4. This document falsely represented that Galka would be traveling, via military orders, to "Iraq, Kuwait, and Germany," as a military contractor; and, that his initial period of leave would span from "October 1, 2017 to October 1, 2018." Galka then requested permission from the Village Green Apartments of Rochester Hills to be allowed to leave his 2014 Chrysler 300, valued at $27,500.00, *see* PSR ¶ 106, in its parking lot while he served abroad. Due to its belief that Galka was on a military errand, it granted his request. At the time Galka submitted this counterfeit document and made his material misrepresentations to the apartment complex authorities, he knew that his sentencing guidelines range was 84-129 months.

This continuing fraudulent conduct, even while he knew he was the subject of a federal investigation, and then as he was preparing for sentencing in this matter, demonstrates the danger that Galka would be capable of if released. Galka is not eligible for compassionate release.

### C.   The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate is statutorily eligible for a sentence modification based on "extraordinary and compelling reasons," compassionate release is not necessarily appropriate. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is still appropriate. As noted above, Galka is a long-time criminal offender who continued to engage in fraudulent conduct during the federal investigation, including until immediately prior to his sentencing. The nature and characteristics of this defendant, in addition to the seriousness of his conduct, disqualify him from consideration for compassionate release.

Even if the Court were to find Galka eligible for compassionate release, the § 3553(a) factors should still disqualify him.

### III.   If the Court were to grant Galka's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Galka's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Galka's motion should be denied.

                              Respectfully submitted,

                              Matthew SCHNEIDER
                              United States Attorney

                              s/ *C. Barrington Wilkins*
                              Assistant United States Attorney
                              211 West Fort Street, Ste. 2001
                              Detroit, MI 48226
                              (313) 226-9621
                              barrington.wilkins@usdoj.gov


Date: May 11, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 11, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

Edward C. GALKA, *Pro Se.*

<u>s/ *C. Barrington Wilkins*</u>
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9621
E-mail:barrington.wilkins@usdoj.gov