# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

                **Plaintiff**                **Honorable Judith E. Levy**

**-vs-**                                          **Case No. 16-cr-20254**

**EDWARD GALKA,**

                **Defendant**

_____/

## EDWARD GALKA'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR <u>COMPASSIONATE RELEASE</u>

It is indisputable that Mr. Galka suffers from at least two underlying conditions, obesity and hypertension, that the Center for Disease Control (CDC) recognizes as serious risk factors for COVID-19.[1] Moreover, Mr. Galka's having tested positive for COVID-19 once, does not prevent him from reinfection.[2]

---

[1] On June 25th, the CDC expanded their list of people at risk of severe medical complications with COVID-19. The CDC removed any specific age threshold to the risk factors. https://perma.cc/UJT9-JMHS. In other words, the CDC has "jettison[ed] earlier warnings that mainly those 65 and older faced higher risk." https://www.statnews.com/2020/06/25/cdc-broadens-guidance-on-americans-facing-risk-of-severe-covid-19/

[2] Counsel apologizes to the Court for his inability to obtain an affidavit from Dr. Markowitz for several unfortunate and logistical reasons. However, counsel not only stands by the earlier representation made, but now supplies this Court with much more information demonstrating Mr. Galka's serious threat of reinfection from COVID-19.

1

Galka's first test was positive. There was no retest. Galka has never been retested for COVID-19 or given a serological antibody test to confirm the result.

This is significant because the CDC has admitted that both false positives and false negatives are not uncommon with polymerase (RT-PCR) tests. "Both the tests for Covid-19 that look for active infections and the **serological antibody tests** (that can identify past infections) have had issues with accuracy." See "Why even a super-accurate COVID-19 test can fail," Vox, May 27, 2020, https://www.vox.com/2020/5/1/21240123/coronavirus-quest-diagnostics-antibody-test-covid. The RT-PCR test, which seeks out the genetic material (RNA) of COVID-19, emphasizes "sensitivity" over "specificity" for an important reason: "The main fear is that a false negative could leave someone to spread the virus unwittingly, so it makes sense to emphasize sensitivity. That way, it will pick up more actual cases, with the trade-off that some positive results might not be correct." *Id.* Michael T. Osterholm, PhD, MPH, director of the Center for Infectious Disease Research and Policy (CIDRAP) at the University of Minnesota explained: "I hope that if nothing else, everyone is learning that having a positive PCR for this particular virus — SARS-CoV-2 — in and of itself does not mean that you're infectious or infected for that matter." See Viguers, Stephanie, "U.S. Taking 'Wrong Approach' to COVID-19 testing, expert warns," June 16, 2020,

2

https://www.healio.com/news/primary-care/20200616/us-taking-wrong-approach-to-covid19-testing-expert-warns.

Beyond the uncertainty of the test and the uncertainty of whether Galka actually contracted the virus, it is BOP policy that when an inmate "tests positive for COVID-19 but is deemed asymptomatic, the BOP conducts no medical evaluation of that patient beyond daily temperature checks." *United States v. McCall*, __ F.Supp.3d __, 2020 WL 2992197 (M.D. Alabama, N. Div., June 4, 2020). This is important because one inmate has already died in the BOP's custody just weeks after it deemed him "recovered" from the virus. *Id.* at *5. To be sure, for an individual with serious risk factors for COVID-19 who has allegedly recovered from the virus, "the evidence reflects that he would not be protected from the possibility of future reinfection." *McCall*, *Id*. at *6-7 ("The court will not play Russian Roulette with McCall's life… motion for compassionate release is granted.").

The government attempts to minimize the risk to Galka's health and life when it suggests that he is immune from infection of the virus because he has previously tested positive. First, **there is simply no medical evidence to support the claim that a person who previously tested positive for COVID-19, and is deemed recovered, is less susceptible to serious adverse health outcomes than they were before they were exposed to the virus**. The government's suggestion

3

that people who have tested positive for the virus are immune is contrary to CDC guidance, which states that it is "not yet known" whether the presence of antibodies provide "immune protection" for COVID-19.[3] Of course, no antibody test was performed on Galka, so we have no idea whether he even has antibodies, much less "immune protection."

Moreover, with each passing day there is more evidence that people who are deemed to have "recovered" from COVID-19 can become seriously ill and die of the disease after their purported "recovery." An example is the case of Adam Solarzano, an inmate at Terminal Island who died on May 24, 2020, less than a month after he was deemed by BOP physicians to have "recovered" from COVID-19. According to the BOP Press Release: On April 16, 2020, inmate Adrian Solarzano, tested positive for COVID-19 at the Federal Correctional Institution (FCI) Terminal Island in San Pedro, California. On May 10, 2020, in accordance with CDC guidelines, Mr. Solarzano was converted to a status of "recovered" following quarantine and no presentation of active symptoms. On Friday, May 15, 2020, Mr. Solarzano was admitted to the local hospital, due to complaints of chest pains and anxiety. He was tested for COVID-19 by hospital staff on May 15 and 16, 2020, with negative results. Mr. Solarzano's condition continued to decline. On Sunday, May 24, 2020, Mr. Solarzano, who had pre-existing medical conditions,

---

[3] https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html

which the CDC lists as risk factors for developing more severe COVID-19, was pronounced dead as a result of the virus by hospital staff.

https://www.bop.gov/resources/news/pdfs/20200527_press_release_trm.pdf.

To be sure, researchers cannot definitively conclude whether Galka, like the late Mr. Solarzano, could contract COVID-19 again and have a more virulent reaction, particularly with his serious comorbidities. William Park, *Can you catch Covid-19 twice?*, BBC (Apr. 22, 2020), https://www.bbc.com/future/article/20200421-will-we-ever-be-immune-to-covid-19 ("Immunity to Covid-19 is not as clear cut as we might hope"). Galka is a sitting duck at Elkton and should not have to be a guinea pig to test this possibility.

For these reasons, Federal courts across this country continue to release otherwise qualified inmates who have previously tested positive for the corona virus. See *Snell v. United States*, Criminal Case No. 16-20222-6 (E.D. Mich. Jun. 2, 2020); *United States v. McCall*, Case No. 2:18-cr-00095, Dkt. No. 96 (M.D. Ala. June 4, 2020.) (granting compassionate release to inmate who tested positive for COVID-19 and finding the "risk of reinfection" to be unacceptable); *United States v. Brown*, Case No. 2:18-cr-360, Dkt. No. 35 (N.D. Ala. May 22, 2020) (granting compassionate release to COVID-19 positive inmate who also suffered from asthma because "in the event [his] condition worsens, medical treatment in and around" the prison "may well be inadequate."); *United States v. Arreola-Bretado*,

5

Case No. 3:19-cr-3410, Dkt. No. 50 (S.D. Cal. May 15, 2020) (granting compassionate release to defendant who tested positive for COVID-19 after concluding she will receive superior medical care outside of the custody of the Otay Mesa detention facility); *United States v. Huntley*, No. 13-cr-119-ABJ, ECF No. 263, at 8 n.9, 10 (D.D.C. May 5, 2020) (ordering compassionate release for defendant who tested positive for COVID-19).

The district court in *McCall* acknowledged that the risk of "reinfection" for an inmate who has already tested positive for COVID-19 is unknown, but it did not accept the government's view that it was appropriate to leave him in prison and hope for the best. *United States v. McCall*, Case No. 2:18-cr-00095, Dkt. No. 96 (M.D. Ala. June 4, 2020). McCall's doctor testified that he should be isolated from other inmates to protect him from the possibility of reinfection, considering the heightened risk of severe illness that he faced due to his pre-existing medical condition. Id at *24.

COVID-19 is indeed a "novel" virus. Seemingly, every day more horrifying effects of the virus become known to the medical community. However, reinfection is not a well-known aspect of the virus, other than we do know that the risk of reinfection is ever present.

On Friday, April 24, 2020, the World Health Organization (WHO) issued a scientific brief saying that the public belief that a one-time infection leads to

6

immunity remains unproven and is unreliable as a basis for response to the pandemic. See WHO, "Immunity Passports" in the Context of COVID-19, https://www.who.int/news-room/commentaries/detail/immunity-passports-in-the-context-of-covid-19 (last accessed June 22, 2020). Specifically, the WHO says that "[t]here is currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection." Id. The risk of reinfection is not merely theoretical. An example of the risk of reinfection can be found in the case of the USS Theodore Roosevelt. Recently thirteen United States sailors from that ship who had apparently recovered from the coronavirus, went through rigorous recovery criteria that exceeded CDC guidelines, and had received negative test results, tested positive for the disease a second time. New research by the Columbia University Mailman School of Public Health has found that "reinfections with endemic coronaviruses are not uncommon, even within a year of prior infection." Risk of Coronavirus Reinfection Remains After Recovery, available at https://www.publichealth.columbia.edu/public-health-now/news/risk-coronavirus-reinfection-remains-after-recovery. While that study covered four endemic coronaviruses—not including SARS-CoV-2, the virus that causes COVID-19—the study found that when reinfection occurred, it was not associated with less severe symptoms. Id. Given the large number of confirmed cases of COVID-19 at FCI Elkton and based on the currently available scientific data, Defendant Galka

7

continues to be at risk of imminent harm based on his underlying medical conditions.

As of May 12, 2020, the CDC's website stated, "Can people who recover from COVID-19 be re-infected with SARS-CoV-2? The immune response to COVID-19 is not yet understood. Patients with MERS-CoV infection are unlikely to be re-infected shortly after they recover, but **it is not yet known whether similar immune protection will be observed for patients with Covid-19.** https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html (emphasis added).

The Journal of the American Medical Association (JAMA) recently spoke to the unknowns regarding re-infection and post-infection immunity. It found that "Whether immunity occurs among individuals after they have recovered from COVID-19 is uncertain. Many human infections with other viral pathogens, such as influenza virus, do not produce a durable immune response…Following infection, detectable…antibodies develop within days to weeks of symptom onset in most infected individuals. **Why some patients seem not to develop a humoral immune response, as reflected by detectable antibodies, is uncertain.**" (Emphasis added) The article then goes on to explain in more detail that people with mild cases may recover before developing antibodies to become immune, and even those who do develop detectable levels of antibodies may not be immune. https://jamanetwork.com/journals/jama/fullarticle/2766097.

The Standing Committee on Emerging Infectious Diseases and 21st Century

Health Threats, The National Academies of Sciences, Engineering, and Medicine, issued a report identifying "gaps in knowledge" related to the duration of antibody response and immunity to COVID-19. Among the gaps in knowledge it identifies are "[W]hether the presence of antibodies confers protection from illness due to re-protective immunity." https://www.nap.edu/read/25774/chapter1#4 (Report at 5-6).

For coronaviruses, immunity seems to wane quickly, and what is unknown is **how long immunity lasts-and only months into the outbreak, there is now way to know.** Antonio Regalado, *What if immunity to covid-19 doesn't last?,* MIT Tech. Rev. (Apr. 27, 2020), available at https://www.technologyreview.com/2020/04/27/1000569/how-long-are-people-immune-to-covid-19/. **Moreover, it's not yet even clear whether mild or asymptomatic cases will even develop antibodies!** *See,* Katarina Zimmer, What Do Antibody Tests For SARS-CoV-2 Tell Us About Immunity? (Apr. 15, 2020), *available at* https://www.the-scientist.com/new-opinion/what-do-antibody-tests-for-sars-cov-2-tell-us-about-immunity--67425. Zimmer's article also indicates that people who are immunocompromised may have less capacity to develop immunity to COVID-19. *Id.*

Two district courts recently granted compassionate release to inmates who had tested positive to COVID-19, based on the state of medical uncertainty as to re-infection. In *U.S. v Common,* 2020 WL 3412233 (C.D. Ill. June 22, 2020), the court

9

granted compassionate release to a 39-year-old inmate suffering hypertension, obesity, and asthma. Defendant had served approximately 18 months of his 120-month sentence. The court cited much of the above-noted medical and scientific evidence, and lack thereof, and further noted that, "In addition to the very real risk of relapse or reinfection, Defendant also may suffer side effects from COVID-19. The available science and preliminary evidence, as well as historical research on other coronaviruses like severe acute respiratory syndrome (SARS) and Middle East respiratory syndrome (MERS), suggests that for some people affected by COVID-19, a full recovery may not happen for years, if at all. See, e.g., Madjid et al., Potential Effects of Coronaviruses on the Cardiovascular System: A Review, available at https://jamanetwork.com/journals/jamacardiology/fullarticle/2763846?guestAccessKey=150724fb-8146-4fc2-a60c-b78955728d41&utm_source=For_The_Media&utm_medium=referral&utm_campaign=ftm_links&utm_content=tfl&utm_term=032720 (suggesting that COVID-19 may cause lingering cardiac damage, as well as making existing cardiovascular problems worse, further increasing the risk for heart attack and stroke)." *Id.* at \*4-5.

*See Also, U.S. v. Yellin, 2020 WL 3488738*, (S.D. Cal. June 26, 2020), where the court, based on *McCall* and the death of Adrian Solarzano, *Supra.,* found that, "First, while Mr. Yellin's medical record states he recovered from COVID-19, the

10

possibility of reinfection persists. This virus is so new that the scientific community does not yet have answers to whether reinfection is possible. (ECF No. 139, Exhs. Q, S, T, U.) If Mr. Yellin were to be re-infected, his numerous underlying medical conditions could make COVID-19 infection deadly for him. Additionally, the death of Adrian Solarzano is an example of at least one inmate dying from COVID-19 after Terminal Island deemed him recovered from the virus. (ECF No. 142, 1:23-2:9; *id.* at Exh. Y.) The Court does not presume to have more information than the experts researching this virus. Without scientific conclusions as to whether reinfection is possible or how long COVID-19 immunity lasts, the Court must err on the side of caution to avoid potentially lethal consequences for Mr. Yellin. *See McCall*, 2020 WL 2992197, at *6 (granting compassionate release because the movant's underlying medical condition "makes the risk of his reinfection unacceptable"); *United States v. Sholler*, ––– F. Supp. 3d –––, 2020 WL 2512416, at *5 (N.D. Cal. May 15, 2020) (granting compassionate release to an inmate at Terminal Island after addressing risk of reinfection). *Id. at *3*.

Edward Christopher Galka is in serious risk of re-infection at Elkton's raging viral hotspot. If re-infected, he is at high risk, given his obesity, together with his otherwise ill-health, of severe illness or death. Is his continued incarceration so important, that we risk his possible death, or lifetime struggle with horrible and hideous lasting effects of COVID-19?

11

As to dangerousness, the government wants to relitigate the facts of the case, as well as other pre-sentencing matters, to argue Defendant Galka's danger to the community. The government's analysis is completely misguided and fails to address current reality. To be clear, the government may as well be arguing that Galka deserves a life sentence. The government's logic is that, based upon Galka's past offense conduct, he will always pose a danger to the community. He will never change. There are no conditions of release this Court can fashion to ensure the community's safety. He will wreck digital havoc forever. Mr. Galka must spend every day possible in custody, even if it means possible death or severe life-long illness; because unlike drug traffickers, child pornographers, bank robbers, and many other inmates convicted of much more serious offenses, well, Mr. Galka just cannot be trusted to continue to follow laws and rules.

Indeed, Courts have granted COVID-19-based sentencing modifications in cases with more serious underlying offenses. For instance, in *United States v. Curtis*, No. 1:03-cr-00533-BAH, Dckt. 238 (D.D.C. Apr. 22, 2020), the court granted a sentencing modification to a defendant serving a life sentence for sex trafficking minors. Despite the "heinous" nature of the crimes, "the spread of COVID-19 in BOP facilities, and defendant's particular susceptibility to the worst effects of that virus adds great urgency to his request."

*Id*. at 7, 11 (citations omitted). The court ultimately reduced the sentence to time served. *Id*.

Two more years in custody are just worth that risk, says the government. This counsel respectfully disagrees.

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Under all the circumstances in this case, the Court should conclude that the time that Edward Galka has already served is sufficient to satisfy the purposes of sentencing. Under *Pepper v. United States*, 562 U.S. 476, 490-93 (2011), the Court can, and indeed must, consider post-offense developments under § 3553(a).

Here, the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk it presents. Although the circumstances of the present offense qualified Mr. Galka for the serious sentence this Court originally imposed, the sentencing purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening illness. In fact, the Eighth Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody. *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp.

13

2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to contagious diseases caused by overcrowding conditions). The § 3553(a) factors can be met in this case by an order of home confinement as a condition of supervised release.

Additionally, Mr. Galka's conduct while incarcerated, establishes that the purposes of punishment have been met. Under *Pepper*, the Court must also consider "the most up-to-date picture" of the defendant's history and characteristics, which "sheds light on the likelihood that [the defendant] will engage in future criminal conduct." 562 U.S. at 492. Since being incarcerated, Mr. Galka has had no tickets or rules violations. It should be noted also that Mr. Galka never violated his bond conditions.

These facts are a good indication of how Galka would behave on supervision. *United States v. Harrell*, No. 13-20198, 2020 WL 2768883, at *2 (E.D. Mich. May 28, 2020) (collecting cases). See *United States v. Trujillo*, 713 F. 1003, 1010 (9th Cir. 2013) (under 18 U.S.C. § 3582(c), "post-sentencing or post-offense rehabilitation" is a "critical factor"). The Court, therefore, can be confident that it can release Galka without compromising community safety. If the Court feels it is necessary, a GPS tether could be ordered as well.

Mr. Galka has been a model inmate. Mr. Galka has displayed excellent behavior in prison, maintaining a record of "clear conduct". Mr. Galka has never been cited

n
n

for disciplinary action in the BOP. Mr. Galka follows rules. He has followed every rule and guideline while incarcerated, without exception.

Edward Galka has shown by his conduct that he no longer threatens public safety, and that granting his compassionate release would not endanger the community.

## CONCLUSION

For the foregoing reasons, Edward Galka respectfully requests that the Court grant this motion for a reduction in sentence and re-sentence him to time served. Further, Defendant Galka does not object to this Court modifying his term of supervised release to include home detention for the period equal to the remaining term of incarceration he would serve without this Court's modification order.

                                              **Respectfully submitted,**

                                              _____
                                              **SANFORD PLOTKIN (P38691)**
                                              **Atty. for Def. Edward Galka**
                                              30445 Northwestern Hwy., Ste. 225
                                              Farmington Hills, MI  48334
                                              248-798-5756
                                              sanfordplotkin@gmail.com

Dated:  July 31, 2020